IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2024 at Jackson

**STATE OF TENNESSEE v. JOEY DEWAYNE CALLAHAN**

**Appeal from the Circuit Court for Marshall County**
**No. 2022-CR-55     M. Wyatt Burk, Judge**

———————————————————

**No. M2023-01238-CCA-R3-CD**

———————————————————

Joey Dewayne Callahan ("Defendant") appeals from his Marshall County Circuit Court convictions for possession with intent to sell or deliver more than 0.5 grams of methamphetamine, possession of a prohibited weapon, possession with the intent to use drug paraphernalia, resisting arrest, and reckless driving, for which he received a total effective sentence of fifteen years' incarceration. Defendant contends that the evidence was insufficient to establish his intent to sell the methamphetamine. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and MATTHEW J. WILSON, JJ., joined.

Kevin S. Latta, Columbia, Tennessee, for the appellant, Joey Dewayne Callahan.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; J. Katie Neff, Assistant Attorney General; Robert J. Carter, District Attorney General; and William B. Bottoms and Lee E. Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

The July 2022 term of the Marshall County Grand Jury issued an indictment charging Defendant with possession with intent to sell or deliver more than 0.5 grams of

methamphetamine, a Class B felony; possession of brass knuckles, a prohibited weapon, a Class A misdemeanor; possession with the intent to use drug paraphernalia consisting of baggies, pipes, and scales, a Class A misdemeanor; resisting arrest, a Class B misdemeanor; and reckless driving, a Class B misdemeanor. *See* Tenn. Code Ann. §§ 39-16-602, -17-425, -17-434, -17-1302; 55-10-205.

At trial, Marshall County Sheriff's Office ("MCSO") Detective Drew Binkley testified that, on March 29, 2021, around 3:00 p.m., he was traveling south on Fayetteville Highway on patrol in an unmarked police cruiser. He stated that he was in a "pack" of six cars, including his, when he saw a Dodge truck in his rearview mirror coming "from the very end of the pack and . . . going an excessive rate of speed[.]" Detective Binkley said that the truck passed the six vehicles on the left and that oncoming traffic "had to get off to the edge of the roadway to keep from getting hit head on." Detective Binkley activated his blue lights and siren and followed the truck, intending to initiate a traffic stop.

Detective Binkley testified that, while catching up to the truck, he "was running 100 miles per hour and the truck was actually pulling away from [him]." He stated, though, that the truck eventually slowed down and stopped. He identified Defendant in the courtroom as the truck's driver; he noted that he was familiar with Defendant. Detective Binkley said that Defendant was alone in the truck and that he eventually learned that the truck was a rental vehicle.

Detective Binkley testified that Defendant "acknowledged that he shouldn't have passed all the vehicles the way he did" and stated that "he just couldn't get back in the pack and that was the reason he passed all of them at once." Detective Binkley said that he noticed brass knuckles sitting on top of the center console near Defendant's right arm. Detective Binkley testified that he asked Defendant to exit the truck for safety reasons, that Defendant became "somewhat argumentative" and upset, and that he repeated the request several times before Defendant complied.

Detective Binkley patted down Defendant and could see a quantity of cash in his front right pocket because the pocket "bulged out at the top." Detective Binkley testified that he felt "another little bulge" in Defendant's front left pocket, which in his experience felt "consistent with narcotics." When asked what was in his pocket, Defendant stated that he did not know. Detective Binkley asked if Defendant minded if he took out the object, and Defendant responded negatively. Detective Binkley was verifying the meaning of Defendant's answer when Defendant "spun around on [him] and [they] came into a physical altercation." Detective Binkley said that they grabbed one another, slid down the side of the truck, and ended up on the ground between the truck and his patrol car. He stated that he was eventually able to handcuff Defendant.

Detective Binkley testified that, during the scuffle, his "walkie-talkie" came off his belt and ended up in the middle of the road; a passerby stopped, asked if Detective Binkley needed help, and retrieved the walkie-talkie, upon which point Detective Binkley radioed for assistance. Detective Binkley stated that he had "a busted up elbow" and a scrape on his knee after the altercation.

After arresting Defendant, Detective Binkley searched him and found $5,262 in cash. Detective Binkley noted that Defendant had been "allowed a length of time to . . . petition to have a hearing to be able to show where that money lawfully came from" but that Defendant did not do so. Detective Binkley said that Defendant's front left pocket contained a black cloth bag containing three plastic baggies of white powder and "some pills." Detective Binkley was concerned that the powder could be fentanyl and asked Defendant what it was, and Defendant responded that it was methamphetamine. Detective Binkley recalled that, after testing, the Tennessee Bureau of Investigation ("TBI") concluded that the powder was 9.76 grams of methamphetamine.

Detective Binkley testified that he also participated in a search of the truck, during which officers collected the brass knuckles, "some baggies," two pipes, a set of digital scales, and sixteen cell phones. Fifteen of the cell phones were in a back compartment behind the seats, and one was in the center console. Detective Binkley testified that they were unable to retrieve any information from the cell phones; some of them would not power on or charge, others did not have a SIM card, and one had a passcode. Detective Binkley noted that he had not had "much luck" with search warrants for cell phones with passcodes and that he did not send the functioning cell phone to be "broken into."

Detective Binkley testified that Defendant also had a "little in-car dash cam" on his person and that he obtained a search warrant for the camera. Detective Binkley explained that the camera was activated by "a loud noise or sudden vibration" and that the camera turned on during his altercation with Defendant.

Detective Binkley testified that, in his experience, average methamphetamine users possessed between one-half of a gram and one gram of methamphetamine at a time. He noted that one "dose" of methamphetamine was one-tenth of a gram. He opined that an average user would not typically have almost ninety-eight doses with them. Detective Binkley stated that drug users did not usually have scales or extra baggies, although they might have paraphernalia like pipes. Detective Binkley averred that the amount of methamphetamine and the presence of baggies and a set of scales was "indicative of someone who [was] going to be repackaging and distributing and selling those narcotics."

On cross-examination, Detective Binkley testified that none of the MCSO patrol cars were equipped with dashboard cameras and that the officers were not equipped with body cameras or "belt recorder[s.]" Detective Binkley stated that he did not believe Defendant was trying to evade him when traveling at a high rate of speed. He denied that Defendant was charged with theft related to the rental truck, and he noted that the truck had not been reported stolen. Detective Binkley stated that the only property inside the truck belonged to Defendant, including the sixteen cell phones. He did not know how many of the phones had an active "data plan." Detective Binkley stated that his office had only successfully unlocked a password-protected cell phone once in the past eight years.

Detective Binkley acknowledged that a person buying drugs could check the accuracy of the weight using a digital scale; he maintained, though, that it was atypical for a person possessing drugs for personal use to have scales. To his knowledge, none of the evidence in this case was tested for DNA or fingerprints.

On redirect examination, Detective Binkley reiterated that the methamphetamine was found in Defendant's front left pocket.

MCSO Detective Tony Nichols testified that he responded to Detective Binkley's request for backup and that Defendant was in handcuffs when he arrived. Defendant told Detective Nichols, "Tony, man, that's not my dope. That's Scotty Blackwell's dope." Detective Nichols noted that he did not know Defendant had any drugs before he made this statement.

Detective Nichols testified that he subsequently executed the search warrant for Defendant's dashboard camera because Detective Binkley was absent from work for several days. Detective Nichols stated that the video recordings on the camera showed "just lines like it had malfunctioned or something" and that most of the audio was "inaudible, just a lot of jumbled mess." Detective Nichols noted that Defendant could be heard saying that he "shouldn't have passed all of those cars."

A recording from the dashboard camera was played for the jury; although much of the audio was unintelligible, in the first recording a man Detective Nichols identified as Defendant said, "D--n, man, I for real wasn't trying to do that, man, I couldn't get back in, so . . . I shouldn't have passed that many cars, I agree," and a second man, who we gather was Detective Binkley, responded, "No, you shouldn't be acting like a d--n idiot, Joey." Defendant repeated that he "couldn't get back in."

On cross-examination, Detective Nichols acknowledged that he was not present for the initial traffic stop or any of Defendant's statements on the recordings. When asked

whether it was his "best guess" that Defendant's voice was on the recordings, Detective Nichols responded, "Sounds just like him every time I have ever talked to him."

MCSO Deputy Christopher Burgess testified that he also responded to Detective Binkley's request for backup and transported Defendant to the jail. He did not know if Defendant had been informed of his *Miranda* rights, and he denied asking Defendant any questions. However, during the drive, Defendant stated that he believed "one of the substances that was found . . . was MDMA[1] and that the narcotics came from Scotty Blackwell."

TBI Special Agent John Scott, Jr., an expert in forensic chemistry, testified that he tested the white powder submitted in this case and identified it as 9.76 grams of methamphetamine. He noted that he tested the contents of the three plastic baggies separately and combined the weights once he verified that they were the same substance. On cross-examination, Agent Scott testified that the paperwork submitted to him did not contain a field weight and did not reflect whether field testing was performed.

Upon this evidence, the jury convicted Defendant as charged.[2] Following a sentencing hearing, the trial court sentenced Defendant for possession of methamphetamine with the intent to sell or deliver to fifteen years as a Range II, multiple offender; in Counts 2 and 3 to eleven months, twenty-nine days at 75% service; and in Counts 4 and 5 to six months at 75% service. The trial court ordered the sentences to run concurrently.

The trial court subsequently denied Defendant's motion for new trial, and this timely appeal follows.

## II. Analysis

Defendant's sole contention on appeal is that the evidence was insufficient to prove his intent to sell the methamphetamine beyond a reasonable doubt. He requests that this

---

[1] MDMA is an abbreviation of 3, 4-methylenedioxymethamphetamine, also called "molly" or "ecstasy."

[2] We note that, after the jury was seated, the proceedings were adjourned for a lunch break. The trial court noted after the break that Defendant was absent; it was apparent from the record that trial counsel was in contact with Defendant by telephone at multiple points thereafter, but the trial court did not ask counsel to disclose the content of the conversations for confidentiality purposes. However, trial counsel affirmed several times for the trial court that Defendant was not involuntarily absent. Defendant was absent for the remainder of the trial, and the trial court revoked Defendant's bond and issued a warrant after the jury returned its verdict.

court reduce his conviction to simple possession of methamphetamine. The State responds that the evidence is sufficient to support Defendant's conviction.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

It is an offense to knowingly possess a controlled substance with the intent to sell or deliver the controlled substance. Tenn. Code Ann. § 39-17-417(a)(4). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). Methamphetamine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-408(d)(2).

Proof of intent to sell or deliver usually consists of circumstantial evidence and the inferences that can be reasonably drawn from that evidence. *See Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Washington*, 658 S.W.2d 144, 146 (Tenn. Crim. App. 1983) (observing that a jury may derive a defendant's intent from both direct and circumstantial evidence). The jury may infer "from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing" in violation of Code section 39-17-417(a). Tenn. Code Ann. § 39-17-419.

As Defendant notes, this court has previously concluded that "to interpret [Code] section 39-17-419 to permit an inference of intent to deliver solely on the amount of drugs

- 6 -

possessed without any other circumstances relevant to the defendant's mental state effectively eliminates the State's burden of proof as to the intent element of the offense." *State v. Belew*, 348 S.W.3d 186, 190 (Tenn. Crim. App. 2005). However, the quantity of drugs was not the sole evidence of intent in this case.

When viewed in the light most favorable to the State, the evidence presented at trial shows that Defendant knowingly possessed a controlled substance with the intent to sell or deliver the controlled substance. Defendant does not contest his knowing possession of 9.76 grams of methamphetamine in his front pants pocket. Relative to intent, in addition to the quantity of methamphetamine involved and Detective Binkley's testimony that an average methamphetamine user would not possess such a large amount for personal use, the jury was presented with evidence that the methamphetamine was packaged in three separate baggies; that the truck contained additional empty plastic baggies, a set of digital scales, and sixteen cell phones; that in Detective Binkley's experience, a drug user normally did not carry scales with them; and that Defendant stated to two officers that the methamphetamine belonged to or came from another person, not that it was only for his personal use. In short, the evidence was more than sufficient for a reasonable jury to conclude that Defendant intended to sell the methamphetamine. Defendant is not entitled to relief on this basis.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

s/ *Robert L. Holloway, Jr.*
ROBERT L. HOLLOWAY, JR., JUDGE

- 7 -